## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EVA GAVIN, Derivatively on Behalf of Nominal Defendant WEST PHARMACEUTICAL SERVICES, INC., | |
| Plaintiff, | Case No. 2:25-cv-03164 |
| v. | JURY TRIAL DEMANDED |
| ERIC M. GREEN, BERNARD J. BIRKETT, QUINTIN J. LAI, DEBORAH L.V. KELLER, DOUGLAS A. MICHELS, JANET HAUGEN, MARK A. BUTHMAN, MOLLY E. JOSEPH, MYLA P. LAI-GOLDMAN, PAOLO PUCCI, ROBERT F. FRIEL, STEPHEN LOCKHART, THOMAS W. HOFMANN, and WILLIAM F. FEEHERY, | |
| Defendants, | |
| and | |
| WEST PHARMACEUTICAL SERVICES, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Eva Gavin ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant West Pharmaceutical Services, Inc. ("West" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding West, legal filings, news reports, securities analysts' reports about the Company, filings in the securities class action captioned *New England Teamsters Pension Fund v. West Pharmaceutical Services, Inc. et al.,* 2:25-cv-02285-JS (E.D. Pa.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff on behalf of West against certain of its current and former officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least February 16, 2023, and February 12, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2.      Based in Exton, Pennsylvania, West is a global manufacturer of technologically advanced, integrated containment and delivery systems for injectable drugs and healthcare products. The Company's products include a variety of proprietary packaging, containment solutions, reconstitution and transfer systems, and drug delivery systems, as well as contract manufacturing, analytical lab services, and integrated solutions.

3.      The Company operates through two global business segments: (a) Proprietary

---

[1] The Individual Defendants are Eric M. Green ("Green"), Bernard J. Birkett ("Birkett"), Quintin J. Lai ("Lai"), Deborah L.V. Keller ("Keller"), Douglas A. Michels ("Michels"), Janet Haugen ("Haugen"), Mark A. Buthman ("Buthman"), Molly E. Joseph ("Joseph"), Myla P. Lai-Goldman ("Lai-Goldman"), Paolo Pucci ("Pucci"), Robert F. Friel ("Friel"), Stephen Lockhart ("Lockhart"), Thomas W. Hofmann ("Hofmann"), and William F. Feehery ("Feehery"). "Defendants" means West and the Individual Defendants.

Products; and (b) Contract-Manufactured ("CM") Products. The Proprietary Products segment includes elastomers and primary containment, drug delivery services, integrated solutions, and analytical lab services, primarily to biologic, generic, and drug customers. Within the Proprietary Products segment, West classifies its offerings as "High-Value Products" ("HVP") and standard products. The CM Products segment serves as a fully integrated business, focused on the design, manufacture, and automated assembly of complex devices, primarily for pharmaceutical, diagnostic, and medical device customers. The CM Products segment's products include a variety of custom CM and assembly solutions, which use technologies such as multi-component molding, in-mold labeling, ultrasonic welding, clean room molding, device assembly, and drug handling capabilities.

4.      During the COVID-19 pandemic, pharmaceutical and biotechnology companies drastically increased their purchase of injectable components in order to produce COVID-19 vaccine delivery devices. As a result, the Company experienced an uptick in demand for its products. Simultaneously, supply chain disruptions caused by the pandemic caused many of the Company's customers to stockpile West's products for non-COVID-19 uses. These simultaneous events temporarily inflated the Company's revenues and margins.

5.      Unsurprisingly, after the COVID-19 pandemic slowed, the Company's customers reduced their purchasing activity, largely so they could work through the excess inventory they had previously stockpiled. As a result, throughout 2023 and 2024, the Company experienced a drastic slowdown in order volumes.

6.      Despite this downward trend, the Individual Defendants repeatedly assured investors throughout the Relevant Period that any financial pressures were temporary and that the Company had strong visibility into customer inventory levels and demand for West's products.

However, in reality, undisclosed customer losses and margin deterioration posed a substantial and continuing threat to the Company's profitability.

7.    The truth began to emerge as early as July 27, 2023, when the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2023 (the "2Q23 Earnings Call"), during which Defendant Birkett, in response to a question on "stocking issues" and "inventory issues," stated, in relevant part:

> [W]hen you think about the COVID vaccine, obviously, there's a stocking-destocking has been going on for the last couple of quarters. And then when we look at the base business, there's some inventory management here and there, but it's very low in amounts when compared to our order book, particularly last year. We have a good handle on it, and we're keeping an eye on and having conversations with customers, but it's a very low impact at West right now.

8.    Defendant Green further stated during the 2Q23 Earnings Call that, "***it's all -- majority of it is around the COVID-19 destocking***. And so, we've been pretty clear on our quarterly cadence last year and what we're seeing this year. So that's probably the majority of it. From the base perspective, we're not seeing a material difference from quarter-to-quarter." (Emphasis added).

9.    On news of the destocking trend, the Company's stock price fell $24.52 per share, or approximately 6.5%, to close at $354.90 per share on June 27, 2023.

10.    The truth continued to emerge throughout the Relevant Period, with the truth fully emerging on February 13, 2025, when the company issued a press release announcing its fourth quarter and full year results for 2024 (the "4Q24 Earnings Release"). In the 4Q24 Earnings Release, and the accompanying 4Q24 Earnings Call (defined herein), West revealed extremely weak 2025 revenue and earnings forecast. The Company attributed this disappointing forecast, in part, to CM Products segment headwinds, including the loss of two of the Company's major customers that had continuous glucose monitoring ("CGM") contracts. The Company also

4

revealed that its SmartDose wearable injector devices, which the Company had previously purported to be a high-margin growth product, would be "margin dilutive" in 2025.

11.     On this news, the Company's stock price fell $123.17 per share, or approximately 38%, to close at $199.11 per share on February 13, 2025.

12.     As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

13.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Green, Birkett, and Lai on May 5, 2025, in the United States District Court for the Eastern District of Pennsylvania.

14.     Furthermore, as detailed herein, as a direct and proximate result of the Individual Defendants' misconduct, the Company repurchased its own stock at artificially inflated prices during the Relevant Period, costing the Company over one billion dollars.

15.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

16.    Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of West's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

18.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

22.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because West is incorporated in this District and maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

23.     Plaintiff is, and has been at all relevant times, a continuous shareholder of West.

*Nominal Defendant*

24.     Nominal Defendant West is a Pennsylvania corporation with its principal executive offices located at 530 Herman O. West Drive, Exton, Pennsylvania 19341. West's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "WST."

*Individual Defendants*

25.     Defendant Green has served as President and Chief Executive Officer ("CEO") of the Company and as Chair of the Board since 2015. According to the Company's public filings,

Defendant Green received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $9,418,624 |
| 2024 | $8,394,201 |

26.    Defendant Birkett has served as Senior Vice President and Chief Financial Officer ("CFO") of the Company since 2018. Birkett previously served as Chief Financial and Operations Officer of the Company from 2022 until 2024. According to the Company's public filings, Defendant Birkett received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $3,637,041 |
| 2024 | $3,137,579 |

27.    Defendant Lai served as Vice President, Investor Relations of the Company from 2016 until 2024.

28.    Defendant Keller has served as a director of the Company since 2017. Keller also serves as Chair of the Company's Corporate Governance Committee and as a member of the Company's Audit Committee and Compensation & Nominating Committee. According to the Company's public filings, Defendant Keller received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|---|---|
| 2023 | $333,451 |
| 2024 | $342,347 |

29.    Defendant Michels has served as a director of the Company since 2011. Michels also serves as a member of the Company's Audit Committee and Nominating & Corporate Governance Committee. According to the Company's public filings, Defendant Michels received

the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $377,005 |
| 2024 | $364,531 |

30.     Defendant Haugen has served as a director of the Company since 2024. Haugen also serves as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Haugen received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $ |
| 2024 | $87,620 |

31.     Defendant Buthman has served as a director of the Company since 2011. Buthman also serves as Chair of the Company's Finance Committee and as a member of the Company's Innovation & Technology Committee. According to the Company's public filings, Defendant Buthman received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $378,227 |
| 2024 | $376,944 |

32.     Defendant Joseph has served as a director of the Company since 2021. Joseph also serves as Chair of the Company's Compensation Committee and as a member of the Company's Finance Committee and Innovation & Technology Committee. According to the Company's public filings, Defendant Joseph received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $321,433 |
| 2024 | $331,782 |

33.     Defendant Lai-Goldman has served as a director of the Company since 2014. Lai-

Goldman also serves as Chair of the Company's Innovation & Technology Committee and as a member of the Company's Finance Committee. According to the Company's public filings, Defendant Lai-Goldman received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $359,348 |
| 2024 | $359,252 |

34.    Defendant Pucci has served as a director of the Company since 2016. Pucci previously served as Lead Independent Director of the Company from May 2022 until April 2025. Pucci also serves as a member of the Company's Audit Committee and Nominating & Corporate Governance Committee. According to the Company's public filings, Defendant Pucci received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $367,437 |
| 2024 | $367,583 |

35.    Defendant Friel has served as a director of the Company since 2020 and as Lead Independent Director since April 2025. Friel also serves as a member of the Company's Innovation & Technology Committee and Nominating & Corporate Governance Committee. According to the Company's public filings, Defendant Friel received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $330,662 |
| 2024 | $342,653 |

36.    Defendant Lockhart has served as a director of the Company since 2022. Lockhart also serves as a member of the Company's Finance Committee and Innovation & Technology Committee. According to the Company's public filings, Defendant Lockhart received the

following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $331,460 |
| 2024 | $331,347 |

37.    Defendant Hofmann has served as a director of the Company since 2007. Hofmann also serves as Chair of the Company's Audit Committee and as a member of the Company's Compensation Committee. According to the Company's public filings, Defendant Hofmann received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $390,349 |
| 2024 | $389,041 |

38.    Defendant Feehery has served as a director of the Company since 2012. Feehery also serves as a member of the Company's Audit Committee, Compensation Committee, and Finance Committee. According to the Company's public filings, Defendant Feehery received the following in compensation from the Company during the Relevant Period:

| Year | Total Compensation |
|------|--------------------|
| 2023 | $362,832 |
| 2024 | $358,660 |

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers and/or directors of West, and because of their ability to control the business and corporate affairs of West, the Individual Defendants owed West and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage West in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of West and its shareholders.

40.    Each director and officer of the Company owes to West and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of West, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of West were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of West, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause

the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

45.     To discharge their duties, the officers and directors of West were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of West were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Pennsylvania and the United States, and pursuant to West's own Code of Conduct (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how West conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of West and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)     Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that West's operations would comply with all

applicable laws and West's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.    Each of the Individual Defendants further owed to West and the shareholders the duty of loyalty requiring that each favor West's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

47.    At all times relevant hereto, the Individual Defendants were the agents of each other and of West and were at all times acting within the course and scope of such agency.

48.    Because of their advisory, executive, managerial, and directorial positions with West, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by West.

## WEST'S CODE OF CONDUCT

50.     The Company's Code of Conduct begins with a letter from Defendant Green, which

states, in relevant part:

> Every day West helps to improve the lives of millions of people around the globe.
> To do so, we hold ourselves to the highest standards of quality, integrity and respect
> – for our customers and ourselves. Together, we work as one team to provide value
> to our business partners and to ensure the safe and effective administration of life-
> saving drugs to patients.
>
> Our core values -- Passion for Customers, Leadership in Quality and One West
> Team -- are reflected throughout the Code of Conduct and establish the central
> principles that govern all that we do at West.
>
> All West Team Members must uphold these values to help ensure that West
> continues as a well-respected, ethical and lawful leader in the healthcare industry.
>
> Our collective success depends on our integrity and each of our actions, so please
> read and make sure you understand and comply with the Code of Conduct.
>
> Every West Team Member is responsible for ensuring that our reputation remains
> strong, and for fostering a culture in which compliance with the Code of Conduct
> and adherence to our core values is paramount.

51.     Under a section titled "West Business Compliance & Integrity," the Code of

Conduct states, in relevant part:

> COMPLIANCE WITH LAWS, REGULATIONS & INDUSTRY CODES
>
> West is committed to fully complying with the laws, rules and regulations of the
> countries where we operate. West Team Members, suppliers and business partners
> are responsible for complying with all applicable laws, rules, regulations and
> company policies.
>
> ROLES & RESPONSIBILITIES
>
> **West Team Members**
>
> - Be knowledgeable about the West Code of Conduct, company policies and
>   procedures that relate to your individual job responsibilities.
> - Be aware of developments in your work area or industry that might impact
>   West's compliance with laws and regulations or reputation.

15

- Speak Up promptly to raise any concerns about potential violations of law, regulations, or the West Code of Conduct or company policy.
- Cooperate fully and honestly in reviews and internal investigations.

**Team Leaders**

Be accountable for creating a culture of business compliance and integrity in which West Team Members understand their responsibilities and feel comfortable raising concerns without fear of retaliation. Leaders' responsibilities include:

- Setting the example for integrity, through words and actions.
- Ensuring West Team Members understand that business results are never more important than ethical conduct and compliance with the West Code of Conduct or company policies.
- Creating an environment where every West Team Member feels comfortable raising concerns or speaking up.
- Taking immediate action, where appropriate, to prevent or address a concern.
- Communicating sincerely and effectively the importance of business compliance.
- Committing adequate resources to monitoring the business's compliance activities on an ongoing basis and conducting periodic audits of key processes.

BUSINESS COMPLIANCE & INTEGRITY

- All West Team Members are expected to take ownership of business compliance and to act with integrity. West's success depends on your personal commitment to comply with this expectation.
- Acting with integrity means delivering on our commitments while adhering to West's Mission and Values, and our Standards. We can do this by:

  — taking responsibility and holding each other accountable;
  — raising concerns and asking questions; and
  — making the right decisions even when they are difficult.

52.    Under a subsection titled "Conflicts of Interest (COI)," the Code of Conduct states:

- The personal interest of a West Team Member must not influence or appear to influence our business judgment or decision making.

- All decisions regarding West and its business interests must be based solely on what is best for West and its stakeholders and must not be improperly influenced by personal interests.

16

- West Team Members may not compete with West or enter into an engagement that directly or indirectly serves a West customer, supplier or competitor.

- West Team Members must disclose actual or potential conflicts of interest to the Business Compliance & Integrity department as soon as possible.

- West Team Members may not accept employment outside West or conduct their own business if there is a potential conflict of interest.

53.     Under a section titled "Our Practices," the Code of Conduct states, in relevant part:

INSIDER TRADING

- West Team Members must not buy or sell West's stocks, bonds, options or other securities while aware of "inside information"—material nonpublic information—relating to West.

- West Team Members must not provide "inside information" to another person who might use it to buy or sell West securities, including spouses, relatives and friends.

- Please contact the Law Department with any questions about making any securities purchases or sales.

QUALITY @ WEST

- West designs, manufactures and provides high-quality products that are safe and effective for their intended use.

- West products and services comply with applicable laws, regulations and industry standards.

- Quality product and system controls are designed to ensure compliance with our high standards and applicable laws.

- West products are properly registered with the relevant regulatory body using truthful and complete information.

- Each West Team Member is expected to provide high-quality work, be familiar with laws and regulations that relate to their areas of responsibility and participate in training programs provided by the Company.

- West Team Members are encouraged to identify and improve practices that could impair product quality, safety or compliance with law.

17

- West adheres to regulatory and generally accepted good manufacturing and laboratory practices, and quality system requirements. . . .

WEST'S RECORDS

- All of West's books, records and accounts must fully and accurately reflect the true nature of its business transactions (e.g., financial statements, time sheets, expense reports, bills, payroll and benefits records, and other essential Company data).

- All Company records are West's corporate assets. These records may be subject to many legal or regulatory requirements and must be maintained according to West's Record Retention policy.

- West Team Members are responsible for retaining and protecting Company records that they access or control.

- Confidential information includes information concerning pricing, products and services under development, and any other non-public information that might be of use to competitors, or that could be harmful to West or its customers if disclosed.

- West Team Members must safeguard the Company's proprietary and confidential information in the same way as other Company assets are protected.

- Each West Team Member has a duty to maintain the confidentiality of a third party's trade secrets and proprietary information, including those of a former employer, and no West Team Member should ever knowingly infringe on the rights of others.

- Confidentiality also requires that you not discuss confidential information about West Team Members, customers, business partners or suppliers with anyone other than another West Team Member who has a proper business need to know this information.

54.    Under a subsection titled "Communicating Publicly," the Code of Conduct states,

in relevant part:

- West markets and sells products in compliance with all applicable laws, rules and regulations.
- Communicating publicly about West, its products, programs and activities must be factual, thoughtful and handled appropriately by designated Team Members.
- Only designated communications Team Members are authorized to post

about West on Social Media (e.g., LinkedIn, Indeed, WeChat, YouTube, etc.).

- All external publications or uses of the West logo, name or other images must be approved in advance by Global Communications.
- Any inquiries or requests from the press, media, financial community or the public regarding business or financial information about West must be referred to Global Communications (media/press) or Investor Relations (investors or analysts).

### WEST'S AUDIT COMMITTEE CHARTER

55.    West's Audit Committee Charter states that the purpose of the Audit Committee is

to:

> [A]ssist the Board of Directors (the "Board") in its oversight of (1) the quality and integrity of the Company's financial statements and the Company's ac- counting and financial reporting processes and financial statement audits, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's internal audit function and independent auditor, (4) the Company's compliance with ethical policies contained in the Company's Code of Conduct and legal and regulatory requirements and (5) the Company's system of disclosure controls and procedures and internal controls over financial reporting.

56.    The Audit Committee Charter states that the Audit Committee shall have the

following duties and responsibilities, among others:

*Oversight of the Company's Independent Auditor*

1.  Having the sole authority (subject to shareholder ratification) to appoint or terminate the independent auditor, if circumstances warrant. The Committee shall be directly responsible for the compensation and oversight of the work of the independent auditor (including resolving disagreements between management and the auditor regarding financial re- porting) for the purpose of preparing or issuing an audit report and related work. The independent auditor shall report directly to the Committee. The Committee shall be informed of any disagreements between management and the independent auditor if they arise, and the resolution of such disagreements. . . .

5.  Review and discuss quarterly reports from the independent auditor on

    a.  all critical accounting policies and practices used;

    b.  all alternative treatments of financial information within generally accepted accounting principles ("GAAP") that have been discussed with

management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

c.  other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences. . . .

*Financial Statement and Disclosure Matters*

10. Review and discuss management's annual report on the effectiveness of the Company's internal control over financial reporting and the independent auditor's attestation report on the Company's internal control over financial reporting.

11. Prior to filing with the SEC, review and discuss with management and the independent auditor the Company's annual audited financial statements, including management's discussion and analysis of financial condition and results of operations. Discuss other matters with the Company's independent auditors as required by the SEC and, if appropriate, recommend that the audited financial statements be included in the Company's Form 10-K.

12. Prior to filing with the SEC, review and discuss with management and the independent auditor the Company's quarterly financial statements, including management's discussion and analysis of financial condition and results of operations.

13. Review and discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

14. Review and discuss with management results of operations, earnings guidance and other financial in- formation provided to the public, including quarterly earnings press releases. Review any relevant items with management and the Company's independent auditors prior to release of any such information.

15. Review and discuss with management, the internal auditor and the independent auditor the effect of accounting and regulatory initiatives, as well as off-balance sheet structures, on the Company's financial statements.

16. Review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's financial risk-assessment and risk-management policies.

17. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or ac- counting policies.

18. Review disclosures made to the Committee by the CEO and the CFO during their certification process for the Form 10-Q and Form 10-K about any significant deficiencies in the design or operation of internal controls, any significant deficiencies or material weaknesses in internal controls and any fraud that involves management or other employees who have a significant role in the Company's internal controls.

19. Prepare and approve the content of the Audit Committee report required to be included in the Company's annual proxy statement. . . .

*Oversight of the Company's Internal Audit Function*

22. Review and approve the appointment, replacement, or reassignment of the internal audit executive. The internal audit executive is accountable to, and shall report directly to, the Audit Committee.

23. Review the compensation of the internal audit executive and participate in the performance review of the internal audit executive.

24. Review and approve the annual audit plan and all major changes to the plan.

25. Review and approve the Internal Audit Charter on an annual basis.

26. Review the results of internal and external quality assessments of the IA function.

27. Receive and review significant findings from completed internal audits (and management's response) and a progress report on the internal audit plan with explanations for any deviations from the original plan.

28. Discuss with the internal audit executive the responsibilities, budget and staffing of the internal audit department and the adequacy and effectiveness of the internal auditing, accounting and financial controls. The Committee shall discuss any recommendation for improvement.

*Oversight of the Company's Business Compliance and Integrity Function*

29. Review procedures for (1) the receipt, retention and treatment of complaints received by the Committee regarding accounting, internal accounting controls, auditing matters, violations of compliance policies contained in the Company's Code of Conduct or failure to meet legal and regulatory requirements and (2) the confidential, anonymous submission to the Chief Compliance Officer and

the audit committee by employees of concerns regarding questionable accounting or auditing matters, violations of the company's Code of Conduct and failure to meet legal and regulatory requirements.

30. Review (i) the Company's Code of Conduct and recommend any changes to the Board; (ii) compliance with all applicable laws, rules and regulations of any governmental entity or securities exchange; and (iii) reports from management, the compliance officer and the Company's internal audit executive and the independent auditor relating to the Company's conformity with applicable legal and regulatory requirements and its Code of Conduct.

31. Review the Company's data privacy program and risks, as identified by the privacy officer, and the steps taken to protect, monitor and mitigate such exposures.

*Other Matters*

32. Review with management the risks faced by the Company and the policies, guidelines, and processes by which management assesses and manages the Company's risks and the steps management has taken to monitor, mitigate, and control such exposures.

33. Review with the Company's general counsel legal matters that may have a material impact on the financial statements. . . .

## SUBSTANTIVE ALLEGATIONS

### The Company's Background

57.    West is a global manufacturer of technologically advanced, integrated containment and delivery systems for injectable drugs and healthcare products. The Company's products include a variety of proprietary packaging, containment solutions, reconstitution and transfer systems, and drug delivery systems, as well as contract manufacturing, analytical lab services, and integrated solutions.

58.    The Company operates through two global business segments: (a) Proprietary Products; and (b) CM Products. The Proprietary Products segment offers elastomers and primary containment, drug delivery services, integrated solutions, and analytical lab services to biologic, generic, and drug customers. West categorizes its Proprietary Products segment into three

categories; (a) HVP components; (b) HVP delivery devices; and (c) standard products. HVP components include vial seals, vial stoppers and syringe plungers under the Company's brands, including FluroTec, NovaPure, and Westar. HVP delivery devices include the Company's SmartDose devices, which are on-body delivery systems ("OBDS").

59.    The CM Products segment is focused on the design, manufacture, and automated assembly of complex devices, primarily for pharmaceutical, diagnostic, and medical device customers. The CM Products segment's products include a variety of custom CM and assembly solutions, which use technologies such as multi-component molding, in-mold labeling, ultrasonic welding, clean room molding, device assembly, and drug handling capabilities. As part of the CM Products segment, the Company develops CGM devices for its customers.

60.    In its public filings, the Company claims that its HVP offerings generate significantly higher margins than the Company's standard proprietary products and CM products, making the strength and profitability of the HVP portfolio critical to West's overall financial performance.

61.    During the COVID-19 pandemic, pharmaceutical and biotechnology companies drastically increased their purchase of injectable components in order to produce COVID-19 vaccine delivery devices. As a result, the Company experienced an uptick in demand for its products. Simultaneously, supply chain disruptions caused by the COVID-19 pandemic caused many of the Company's customers to stockpile West's products for non-COVID-19 uses. These simultaneous events temporarily inflated the Company's revenues and margins.

62.    Unsurprisingly, after the COVID-19 pandemic slowed down, the Company's customers reduced their purchasing activity, largely so they could work through the excess

inventory they had previously stockpiled. As a result, throughout 2023 and 2024, the Company experienced a drastic slowdown in order volumes.

63.    Throughout the Relevant Period, the Individual Defendants repeatedly assured investors that any financial pressures West was experiencing were temporary and that the Company had strong visibility into customer inventory levels and demand for West's products.

***Individual Defendants' Materially False and Misleading Statements***

64.    On February 16, 2023, the Company issued a press release announcing its financial results for the fourth quarter and full year 2022 (the "4Q22 Earnings Release"), wherein the Company revealed that its 2023 financial guidance of net sales was in the range of $2.935 billion to $2.960 billion. The 4Q22 Earnings Release also stated that net sales in the CM Products segment grew 2.2% to $123.9 million during the fourth quarter of 2023.

65.    Additionally, Defendant Green was quoted in the 4Q22 Earnings Release as stating, in relevant part, that "I am pleased to report that we had a solid finish to 2022 and that we enter 2023 with a strong order book and continued demand for our core business," and that West "remain[s] committed to a capital spending program that expands our high-value product (HVP) manufacturing capacity to stay ahead of our accelerating customer demand from recent launches and anticipated drug programs in the coming years."

66.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2022 (the "4Q22 Earnings Call"). During the 4Q22 Earnings Call, Defendant Green highlighted the Company's margins, stating, in relevant part, that the Company's "expected margins for this year are significantly above pre-pandemic 2019 levels" and that the margins "underscore[] the strength of our financial construct with annual margin expansion of 100 basis points or more per year." During the question and answer section

of the 4Q22 Earnings Call, Defendant Birkett, in response to a question regarding the effect of decreased revenue due to COVID-19 on the Company's margins, stated:

> [W]ith regard to your question on margin, it's not as simple as one product coming out and another product going in. So we're looking at it where there's a mix impact, obviously, with the COVID revenues falling off and they have been higher-margin products. And we've also got the impact of inflation on our cost base. So you've got those two headwinds. And then as we alluded to, we talked about earlier is the increase in price that we're seeing is above what we would normally see in our business. So that helps offset some of this margin pressure.
>
> And then we have a very specific cost initiatives within our business, both from an operations manufacturing perspective and then on SG&A and R&D, really looking at cost control and cost management. That is delivering a number of efficiencies for us. So it helps us to overcome some of the margin challenges, but not all of them. And then that goes back to the point earlier, we're not actually -- margin is not stepping back to pre-COVID levels. We're maintaining or holding on to a lot **of** the improvements that we made or the gains that we made or the gains that we made.

67.     Shortly thereafter, on February 21, 2023, the Company filed its annual report for 2022 on a Form 10-K with the SEC (the "2022 10-K"). In addition to affirming the previously reported financial results, the 2022 10-K, under a section titled "Impact of COVID-19 and other Macroeconomic Factors," stated, in relevant part, that "[o]ur capital and financial resources, including overall liquidity, remain strong." The 2022 10-K also listed the following as an "Industry Risk Factor," highlighting the risk as merely hypothetical, "[i]f we are unable to provide comparative value advantages, timely fulfill customer orders, or resist pricing pressure, we will have to reduce our prices, which may reduce our profit margins."

68.     The 2022 10-K was signed by Defendants Green, Birkett, Winters, Buthman, Feehery, Friel, Hofmann, Joseph, Keller, Lai-Goldman, Michels, Pucci, and Lockhart. The 2022 10-K was also accompanied by certifications made by Defendants Green and Birkett pursuant to Sections 13(a) and 15(d) of the Exchange Act and Section 302 of the Sarbanes Oxley Act of 2002 (the "SOX Certifications"), wherein Defendants Green and Birkett attested to the accuracy of the

2022 10-K.

69.    On March 15, 2023, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2023 Proxy"). The 2023 Proxy highlighted the Board's oversight function, stating, in relevant part:

The Board's Role in Risk Oversight

The Board and its Committees play an active role in overseeing Management's day-to-day responsibility for assessing and managing our risk exposure.

The Board regularly reviews and monitors the risks associated with our enterprise strategy, financial condition and operations and specifically reviews the enterprise risks associated with our five-year plan. In particular, the Board reviews our risk portfolio, confirms that Management has established risk management processes that are functioning effectively and efficiently and are consistent with our corporate strategy, reviews the most significant risks and determines whether Management is responding appropriately to these risks.

The Board performs its risk oversight role by using several different levels of review. Each Board meeting begins with an overview by the CEO that describes the most significant issues, including risks affecting the Company, as well as business updates from each reportable segment. In addition, the Board reviews in detail the business and operations of each reportable business segment quarterly, including the primary risks associated with that segment. . . .

Each Board Committee has been delegated the responsibility for the oversight of specific risks that fall within its areas of responsibility, as cataloged through the RIM process, including:

- The Audit Committee oversees the processes used in our ERM program and also oversees the management of financial reporting, compliance, litigation and cybersecurity risks, as well as the steps Management has taken to monitor and control such exposures

- The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans and arrangements and the extent to which those policies or practices increase or decrease risk for the Company

- The Finance Committee assesses the risks associated with allocation of our capital, potential acquisitions, divestitures and major business partnerships

- The Innovation and Technology Committee reviews risks associated with

emerging, and potentially disruptive, science and technology trends, quality and regulatory landscapes changes, intellectual property and our innovation, research and development and technology strategy

- The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board, potential conflicts of interest, communications with shareholders, ESG and the effectiveness of the Board

Although each Committee is responsible for evaluating certain risks and overseeing the management of those risks, the full Board is regularly informed about those risks through regular Committee reports.

70.    On April 27, 2023, the Company issued a press release announcing its financial results for the first quarter of 2023 (the "1Q23 Earnings Release"). The 1Q23 Earnings Release reported net sales of $716.6 million for the quarter and revealed that the Company was increasing its 2023 financial guidance to a range of $2.965 billion to $2.990 million. Defendant Green was quoted in the 1Q23 Earnings Release as stating, in relevant part:

> We had a solid start to the year and are reaffirming our full-year organic sales growth outlook[.] We delivered strong performances in both our Generics and Pharma market units, as our teams are addressing certain longer lead-time factors. Our Biologics market unit had continued growth in base demand; however, these efforts were offset by an expected decline in COVID-19 related sales. ***Our capital spending program remains on track, and we expect high-value product (HVP) global capacity expansion projects to be completed throughout the rest of the year and in 2024, as we prepare for future demand growth from our customers***.

(Emphasis added).

71.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2023 (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Green highlighted the Company's improved visibility into consumer demand, stating, in relevant part, "now we're back into that environment, have better visibility, better -- as we do make to order, our customers are giving us visibility of their demands over the next several quarters."

72.    Also on April 27, 2023, the Company filed a quarterly report for the period ended March 31, 2023, on a Form 10-Q with the SEC (the "1Q23 10-Q"). The 1Q23 10-Q affirmed the previously reported financial results from the 1Q23 Earnings Release. The 1Q23 10-Q was signed by Defendant Birkett. The 1Q23 10-Q was also accompanied by SOX Certifications made by Defendants Green and Birkett, wherein they attested to the accuracy of the 1Q23 10-Q.

73.    On May 11, 2023, Defendant Birkett attended the Bank of America 2023 Healthcare Conference on behalf of the Company. During the conference, Defendant Birkett stated, in relevant part:

> I believe that we're much closer to our customers now than we have been in the past and understanding their inventory positions. And it is something that we managed quite effectively as we move through COVID with where, in some parts of our business, we had constraints, so we really had to manage the supply to customers.

74.    Also during the conference, Defendant Birkett assured investors that the consumer destocking was not affecting the Company's HVP portfolio, stating, in relevant part, "what we're seeing more so is within the standard part of our portfolio, ***not HVP but with the standard part***, we're seeing customers manage their inventory more effectively." (Emphasis added).

75.    On July 27, 2023, the Company hosted the 2Q23 Earnings Call, during which Defendant Birkett touted the Company's strong margins, stating, in relevant part:

> We're seeing that continued growth in high-value products ex- COVID and retain that positive impact that's flown into margin. We're also improving the throughputs within our facilities, getting better levels of efficiency, and we're seeing that partly because of the capacity that we're layering in. But, again, improvements to our existing infrastructure and that combination is delivering to those improved margins. And again, that's part of the overall construct that we've been talking about over the last number of years. So we just continue to deliver on that.

76.    The statements contained in ¶¶ 64-75 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the

Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

77.     The truth about the Company's destocking issues began to emerge as early as July 27, 2023, when Defendant Birkett, in response to a question on "stocking issues" and "inventory issues" during the 2Q23 Earnings Call, stated, in relevant part:

> [W]hen you think about the COVID vaccine, obviously, there's a stocking-destocking has been going on for the last couple of quarters. And then when we look at the base business, there's some inventory management here and there, but it's very low in amounts when compared to our order book, particularly last year. We have a good handle on it, and we're keeping an eye on and having conversations with customers, but it's a very low impact at West right now.

78.     Defendant Green further stated during the 2Q23 Earnings Call that, "***it's all -- majority of it is around the COVID-19 destocking***. And so, we've been pretty clear on our quarterly cadence last year and what we're seeing this year. So that's probably the majority of it. From the base perspective, we're not seeing a material difference from quarter-to-quarter." (Emphasis added).

79.     On news of the destocking trend, the Company's stock price fell $24.52 per share, or approximately 6.5%, to close at $354.90 per share on June 27, 2023.

80.     Despite these destocking issues, the Individual Defendants continued to mislead investors and the public by assuring them that the Company was continuing to experience a strong

demand for its products. On August 16, 2023, Defendants Green and Lai attended the UBS Genomics 2.0 and MedTech Innovations Summit on behalf of the Company, during which Defendant Green assured the public that "[s]o right now, where we stand, what we see is not a lot of destocking with our products." Also during the conference, Defendant Lai touted the Company's HVP, stating. "HVPs are going to be the driver of top line as well as gross and operating margin expansion."

81.    On September 14, 2023, Defendant Birkett attended the Bank of America Global Healthcare Conference on behalf of the Company, during which he stated that "[w]e're seeing strong demand in our core business" and that "we've done a really good job on that and continuing with revenue growth, the margin performance, managing through inflationary periods and how we've adjusted to that and reorganized our business has been very positive." In response to a request to comment on the Company's drivers of operating margin expansion during the conference, Defendant Birkett stated, in relevant part:

> The typical driver for the 100 basis points is mix shift and driving high-value products, and that still stands. That is the main driver. . . .
>
> That's probably north of where we would typically be . . . given that we had to cover some of these inflationary pressures. And that was part of being able to do that and manage that cost base, but we're also driving a lot of cost efficiencies and operational excellence within our business. So taking cost out, becoming a lot more efficient, introducing higher levels of automation, better throughput. So there's a number of drivers there.

82.    On October 26, 2023, the Company issued a press release announcing its financial results for the third quarter of 2023 (the "3Q23 Earnings Release"). The 3Q23 Earnings Release reported that the Company had net sales of $747.4 million during the quarter, constituting an increase of 8.8% from the same quarter in 2022, net sales of $602.5 million in the Proprietary Products segment, constituting growth of 6.3% from the same quarter in 2022, and net sales of

$144.9 million for the CM Segment, constituting growth of 20.8%. Defendant Green was quoted in the 3Q23 Earnings Release as stating, in relevant part:

> We had a solid quarter of organic net sales growth, driven by our Proprietary Products' high-value product (HVP) and strong Contract Manufacturing components[.] We are observing a slowdown in restocking trends by large Pharma and Generic customers, which is reflected in our revised guidance. As we look to the fourth-quarter 2023, we anticipate double-digit base, non-COVID-19-related organic sales growth, fueled by strong HVP component demand with certain customers and therapeutic categories.

83.    On the same day, the Company filed a quarterly report for the period ended September 30, 2023, on a Form 10-Q with the SEC (the "3Q23 10-Q"), wherein the Company affirmed its previously reported financial results. The 3Q23 10-Q was signed by Defendant Birkett and was accompanied by SOX Certifications made by Defendants Green and Birkett, wherein they attested to the accuracy of the 3Q23 10-Q.

84.    The statements contained in ¶¶ 80-83 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

85.    The truth of the Company's destocking issues was again revealed to the public on

October 26, 2023, when the Company hosted an earnings call for investors and analysts to discuss

its financial results for the third quarter of 2023 (the "3Q23 Earnings Call"). During the 3Q23

Earnings Call, Defendant Green touted the demand for the Company's products, stating, in

relevant part:

> But as the injectable space continues to grow in GLP-1, as new molecules are approved and launched, we're -- and the investments we're making both on the Proprietary and CM side, we have a good visibility of cadence of what we're being asked to build support through our global network to support the demand.
>
> I'll just be clear, one other aspect is on the Proprietary side, we always enjoy a very high participation rate. On the CM side, we've been very clear that our customers are looking at multiple suppliers to support them, and we're one of them. So we're positioned very well on both sides of the business.

86.    During the question and answer section of the 3Q23 Earnings Call, when asked

about the effects of destocking on the Company, Defendant Lai stated, in relevant part:

> So maybe it's just a definition or just maybe when you say destocking, we think of it more as customers that are having a demand issue like in COVID-19 and what they're doing is they're not reordering. ***And they're taking down their safety stock and consuming their safety stock. And that's certainly happening in COVID-19, which we're seeing year-over-year declines***.
>
> The other impact is the fact that we have been behind in terms of delivering because of our capacity constraints. And then as we've been able to restock, the base growth that you've seen in generics and pharma is well above the financial construct. So, well, that has been going on for the first part of this year.
>
> What we're seeing now is that, that base growth is going to temper, it's not declining. ***It's just not going to be as high as we thought it was going to be in Q4. That's why we're calling it a slowing of a restock***. It's not necessarily a destock situation. And again, a lot of it happens is the fact that we've done a really good job of clearing the backlog. We've been -- we've gone to our customers. We said, "Hey, we have that capacity to deliver product. And they said, "No, given where we are in the year, given where our manufacturing schedules are, we would rather be delivered next year instead of Q4.

(Emphasis added).

87.    Also during the 3Q23 Earnings Call, in response to a question on the margin step

down between the third quarter and the fourth quarter of 2023, Defendant Lai revealed that the

Company was anticipating lower volumes for the fourth quarter, stating, in relevant part:

> Really, it's just utilization and absorption given that we're probably going to have
> lower volumes through our facilities in the fourth quarter, we're just -- we just want
> to make sure that we have a reasonable swag at gross margin. And then we're going
> to continue to manage our costs on the SG&A and R&D line -- but -- so that's
> where the margin impact is really going to be reflected, especially in proprietary
> products margin for the quarter.

88.     Following the 3Q23 Earnings Call, the Company's stock price declined $30.68 per

share, or approximately 8.5%, to close at $372.32 per share on October 26, 2023.

89.     Despite this, the Individual Defendants again continued to downplay the effects

destocking was having on the Company and assured investors that the Company was well-

positioned going forward. On November 14, 2023, Defendant Green participated in the Jeffries

London Healthcare Conference on behalf of the Company, wherein he touted the Company's

visibility into demand, stating, in relevant part, "[s]o we have visibility over the next, call it, four

to eight quarters of demand of our customers."

90.     On February 15, 2024, the Company issued a press release announcing its financial

results for the fourth quarter and full year of 2023 (the "4Q23 Earnings Release"), during which

the Company reported net sales of $732 million during the fourth quarter and net sales of $2.950

billion for the full year. The 4Q23 Earnings Release also reported that net sales in the Proprietary

Products segment were $593.7 million, constituting growth of 1.5% from the same quarter in 2022,

net sales in the CM Products Segment were $138.3 million, constituting growth of 11.6% from the

same quarter in 2022, and that net sales were expected to be in a range of $3.000 billion to $3.025

billion in 2024. Defendant Green was quoted in the 4Q23 Earnings Release as stating in relevant

part:

> We had strong 2023 base organic sales growth, excluding the headwinds from

lower pandemic-related sales, led by high-value product (HVP) components and devices and contract manufacturing[.] Our continued investments in both HVP as well as contract manufacturing capacity to support customer demand will fuel our long-range financial construct of future organic sales growth and operating profit margin expansion.

91.    The statements contained in ¶¶ 89-90 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

92.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the fourth quarter of 2023 (the "4Q23 Earnings Call"), during which the Company revealed destocking issues. During the 4Q23 Earnings Call, Defendant Green stated that he was "disappointed that we're not – we will not achieve our usual full year organic sales and margin expansion in 2024." Defendant Birkett also stated that "there's still a level of destocking so it's probably low single-digit growth in proprietary. And then on a consolidated basis, also, we would see a returning to growth in Q2." Defendant Green also revealed that destocking had affected the Company's HVP portfolio, stating, in relevant part:

One of the areas that [destocking] was more pronounced on the standard and bulk areas, but we're also seeing it in some cases in parts of our HVP portfolio. So, it is,

I would say it's across a broader set, but I would say the primary area has been the bulk and of the standard area. . . .And however, based on the conversations in the data we've been looking at with our customers, there will be some still in Q2 that have some destocking, but not as pronounced in Q1. So, it's really most of it that we're seeing is really a Q1 phenomenon. . . . And when we look at growth in our business, particularly in the Proprietary, it is led by the high-value products in the component side that is leading the growth.

93.    Despite these destocking issues, the Company continued to downplay the effects on its demand and financial success, with Defendant Green emphasizing the potential strength and future growth of the Company's HVP offerings, stating, in relevant part:

[W]e will be expanding our industry-leading capacity with major HVP expansion projects in Jersey Shore and Eschweiler as well as other projects across the global network. Another driver of growth with a bright future comes from our HVP devices, which includes our injection delivery device platforms, Crystal Zenith containment solutions in the admin systems. HVP devices had very strong double-digit organic sales growth in 2023 and now represent 10% of overall sales.

West platforms are an integral part of our customers' drug device combination products they're making a difference to patients. And this year, we have had multiple capital expansion projects that will increase capacity for SmartDose, SelfDose and Admin Systems, with some expected to come online in the second half of 2024 and fully online in 2025.

And lastly, the area with the most potential for our future growth is our HVP capacity to support a mix shift. . . .The mix shift of legacy to HVP has historically been a smaller contributor for us compared to contribution from newly approved drugs. However, with the industry landscape changing, regulators are introducing new regulations for higher quality, lower particulate, and more standardized solutions. And therefore, customers are looking to upgrade their standard primary components.

94.    Furthermore, during the question and answer portion of the 4Q23 Earnings Call, Defendant Green attributed the Company's decline in its Proprietary Products segment to destocking from a limited number of customers, stating, in relevant part, "[w]hile I mentioned two other factors, majority is destocking, and it's specifically 75% of the destocking has come from six customers." Moreover, Defendant Birkett assured investors, when asked about the Company's visibility into destocking, that "we don't see it as being a long-term problem."

35

95.    On news that the Company was experiencing destocking issues in its HVP portfolio, the Company's stock price declined $57.49 per share, or approximately 14%, to close at $350.70 per share on February 15, 2024.

96.    The Company continued to downplay the effects of destocking on the demand for West's products and continued to assure investors that the Board was properly overseeing risks to the Company. On February 20, 2024, the Company filed an annual report for 2023 on a Form 10-K with the SEC (the "2023 10-K"), wherein the Company affirmed its previously disclosed financial results for the fourth quarter and full year 2023. The 2023 10-K also stated, under "Industry Risks," that "[i]f we are unable to provide comparative value advantages, timely fulfill customer orders, or resist pricing pressure, we will have to reduce our prices, which may reduce our profit margins."

97.    The 2023 10-K was signed by Defendants Green, Birkett, Buthman, Feehery, Friel, Hofmann, Joseph, Keller, Lai-Goldman, Michels, Pucci, and Lockhart. The 2023 10-K was also accompanied by SOX Certifications made by Defendants Green and Birkett, wherein they attested to the accuracy of the 2023 10-K.

98.    On March 13, 2024, the Company filed a proxy statement on a Schedule 14A with the SEC (The "2024 Proxy"). The 2024 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

**The Board's Role in Risk Oversight**

The Board and its Committees play an active role in overseeing Management's day-to-day responsibility for assessing and managing our risk exposure.

The Board regularly reviews and monitors the risks associated with our enterprise strategy, financial condition and operations and specifically reviews the enterprise risks associated with our five-year plan. In particular, the Board reviews our risk portfolio, confirms that Management has established risk management processes that are functioning effectively and efficiently and are consistent with our corporate

strategy, reviews the most significant risks and determines whether Management is responding appropriately to these risks.

The Board performs its risk oversight role by using several different levels of review. Each Board meeting begins with an overview by the CEO that describes the most significant issues, including risks affecting the Company, as well as business updates from each reportable segment. In addition, the Board reviews in detail the business and operations of each reportable business segment quarterly, including the department-level risks associated with that segment. . . .

Overall, the Board focuses on the enterprise risks affecting the Company. Each Board Committee has been delegated the responsibility for the oversight of specific risks that fall within its areas of responsibility, as cataloged through the RIM process, including:

- The Audit Committee oversees the processes used in our ERM program and also oversees the management of financial reporting, compliance, litigation and cybersecurity risks, as well as the steps Management has taken to monitor and control such exposures

- The Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation policies, plans and arrangements and the extent to which those policies or practices increase or decrease risk for the Company

- The Finance Committee assesses the risks associated with allocation of our capital, potential acquisitions, divestitures and major business partnerships

- The Innovation and Technology Committee reviews risks associated with emerging, and potentially disruptive, science and technology trends, quality and regulatory landscapes changes, intellectual property and our innovation, research and development and technology strategy

- The Nominating and Corporate Governance Committee manages risks associated with the independence of the Board, potential conflicts of interest, communications with shareholders, ESG and the effectiveness of the Board

Although each Committee is responsible for evaluating certain risks and overseeing the management of those risks, the full Board is regularly informed about those risks through regular Committee reports.

99.     The statements contained in ¶¶ 96-98 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

100.    On April 25, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024 (the "1Q24 Earnings Release"), wherein the Company reported net sales of $695.4 million for the first quarter, a decline of 3% from the same quarter in 2023, net sales of $559.5 million for the Proprietary Products segment during the quarter, a decline of 4% from the same quarter in 2023, and net sales of $135.9 million for the CM Products segment, an increase of 1.8% from the same quarter in 2023. Defendant Green was also quoted in the 1Q24 Earnings Release as stating:

> We had a solid start to the year and our full-year 2024 financial outlook remains unchanged[.] We are actively managing the timing of inventory decisions by some of our customers, and our recent order trends reinforce our prior outlook for stronger organic sales growth in the second half of the year. As we navigate the near-term headwinds, we are controlling our costs while making strategic investments in new manufacturing capacity in both our Contract Manufacturing segment and our Proprietary Products segment, which positions us well for future organic sales growth.

101.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Green informed investors that the Company was continuing to see

destocking by its customers, stating, in relevant part:

> We delivered a solid start to the year. During the quarter, we again saw growth in our top-tier HVP component, NovaPure, and our HVP devices such as SmartDose. *We also continue to see inventory management or destocking by our larger mature customers that are working down their inventory closer to pre-pandemic levels*. With that said, Q1 had a solid start due to favorable order timing of customer deliveries fulfilled in the quarter.
>
> I want to address the question that many of you are asking, are we seeing an inflection in destocking? The short answer is not quite yet. *Several customers are still working through their safety stock levels, and we still expect Q2 to have an impact from customer destocking and customer order trends continue to indicate a stronger second half of 2024 with a return to more typical order patterns in Q4*.

(Emphasis added).

102.    Also during the 1Q24 Earnings Call, Defendant Birkett addressed the Company's

disappointing margins, stating:

> Looking at margin performance. slide 11 shows our consolidated gross profit margin of 33.1% of Q1 2024, down from 37.9% in Q1 2023. Proprietary Products first quarter gross profit margin of 37% was 550 basis points lower than the margin achieved in the first quarter of 2023. The key drivers for the decline in Proprietary Products gross profit margin were lower sales volume and an unfavorable mix of products sold, partially offset by increased sales prices.
>
> Contract Manufacturing first quarter gross profit margin of 17% was 60 basis points below the margin achieved in the first quarter of 2023, primarily due to inflationary labor costs and an unfavorable mix of products sold, partially offset by increased sales prices.

103.    During the question and answer section of the 1Q24 Earnings Call, in response to

a question on whether standard packaging was the "weakest" part of the Company's business,

Defendant Green stated:

> Well, if I -- let me rephrase that. *I think the HVP components for us, most of the destocking that we've experienced earlier this year is around that category*. However, that particular part of the portfolio will ramp up quite -- very nicely sequentially throughout the year. *So it is -- most of the -- if you look at the Q1, the Proprietary elastomer side, it really is due to destocking at this point in time but very strong outlook towards the end of the year and very strong obviously beyond that*.

(Emphasis added).

104.    In response to the same question, Defendant Birkett tried to assure investors that

the Company would get back on track, stating:

> Yeah. I think, Paul, on that, it's important to note that we don't anticipate any major mix shift. There's still the growth opportunities around HVP and in the biologics space. And even in Q1, that continued to grow. And you could see the growth driven there by the growth in NovaPure. So from a mix perspective, I think when you look at it in the whole, areas are growing. And our growth potential, as we look out past 2024, around standard components and packaging and HVP, the trajectory is the same; that they are the growth drivers.

105.    Later during the question and answer session of the 1Q24 Earnings Call, Defendant

Green stated:

> Yeah, David. ***So it was really in some of the other areas of high value products where we saw some step back in Q1, but what we do expect to see as we progress through the year, the volumes around that business to increase again sequentially***. And that's when we talked about the destocking earlier on in the year, we were saying it was across all different parts of our business. ***So we would expect that HVP growth to accelerate as we move through the year and then the margin-and that to be reflected in our margins***. And also we'll get the pickup of incremental or increased throughput as we move through the year. I think Q1 was our lowest level of throughput and we're a high volume business. So absorption does get impacted.

(Emphasis added).

106.    Following the news of the continued destocking and the Company's disappointing

margins, the Company's stock price declined $17.55 per share, or approximately 4.5%, to close at

$368.18 per share on April 25, 2024.

107.    On July 25, 2024, the Company issued a press release announcing its financial

results for the second quarter of 2024 (the "2Q24 Earnings Release"), wherein the Company

reported net sales of $702.1 million for the quarter, a decline of 6.9% from the same quarter in

2023, net sales of $559.7 million for the Proprietary Products segment, a decline of 9.4% from the

same quarter in 2023, and net sales of $142.4 million for the CM Products segment. The Company also lowered its net sale guidance for 2024 to a range of $2.870 billion to $2.900, compared to the prior range of $3.000 billion to $3.025 billion, and lowered its adjusted-diluted earnings per share ("EPS") for 2024 to a range of $6.35 to $6.65, compared to the prior guidance range of $7.63 to $7.88. Also, in the 2Q24 Earnings Release, Defendant Green was quoted as stating that "[t]he second quarter continued to be impacted by an elevated level of customer destocking." However, Defendant Green attempted to ensure investors that the Company was on track, and was quoted as stating "[b]ased on our confirmed order book and ongoing customer conversations, we remain confident in a return to organic growth in the fourth quarter and as we move into 2025."

108.    On the same day, the Company hosted an earnings call for investors and analysts to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"), during which Defendant Green stated, in relevant part:

> We had a lower-than-expected second quarter impacted by continued customer destocking. That being said, we are seeing promising signs from our customers that give us confidence of a turning point in this trend. Looking ahead, we expect the second half of the year to be stronger than the first half with a return to year-over-year organic growth in the fourth quarter led by our Proprietary Products segment, specifically biologics. . . .
>
> Another focus for our capital allocation is our HVP devices, which includes our self-injection devices. Our platforms are an integral part of our customers' drug-device combination products that are making a difference to patients. These expansion projects remain on target for the back half of the year and 2025.
>
> Our promising growth drivers have us positioned to drive significant value for our customers, the patients and shareholders as we move forward.

109.    Also during the 2Q24 Earnings Call, Defendant Birkett attributed the Company's decline in sales to certain offerings in West's Proprietary Products segment, stating, in relevant part, "[h]igh value products, which made up approximately 71% of proprietary product sales in the quarter declined by double-digits, primarily due to decreased sales of our Westar, Daikyo

Crystal Zenith and FluroTec products."

110.    During the question and answer session of the 2Q24 Earnings Call, Defendant

Birkett, in response to a question on the continued impact of destocking on the Company, including

the effects on West's product mix and margins, stated, in relevant part:

> Yeah. So on the destocking, Justin, when we look at that, we have been seeing that
> in our Biologics segment and in Generics, that's where we saw the biggest impacts
> here in the second quarter. And you know that's really where-as we were going
> through COVID, that's where we saw the most pressure also around lead times
> where customers really had to manage their supply chains. And that's where we
> believe the safety stock built over time. So that's why we are seeing destocking in
> those areas right now, and -- to a larger extent comparing this to our other
> market units. And you can see that play through then on the impact on our gross
> margin and operating margin is that that's impacting our mix. So we're having, one,
> volume impact because of that, but we're also having a mix impact.
>
> And I think what we saw in COVID and what we would see when we return to
> normalized growth rates and in seeing that gross margin and operating margin
> expand in line with our long-term constructs and potentially beyond that. So that's,
> I think that's where we – when we look at it, we're looking at it from a revenue
> perspective, but also looking at an impact on margin, and saying how do we get
> back to the margins that we're used to delivering on? And when we see those
> biologics and generic market start to normalize, we'll see the revenue rebound and
> also from a margin perspective, we'd see that also.

111.    Also during the question and answer section of the 2Q24 Earnings Call, when asked

about West's customers' inventory levels and when the Company expected ordering patterns to

normalize, Defendant Green stated:

> Yeah, Justin, exactly that's the point. We're unfortunately during the pandemic due
> to the demand that was put on our business, our lead times did go up to anywhere
> between 30 weeks to 50 weeks. And with the consistency now in the last several
> quarters of, call it, eight to 12 weeks, sometimes earlier, sometimes a little bit longer
> depending on the processing, our customers are realigning their reordering patterns
> based on those lead times. And we're seeing that clearly. ***So, as they built
> inventories during the longer lead time periods and during the supply chain
> constraints during the pandemic, and across the whole industry, we're seeing that
> also coming down, but also the realigning***.
>
> So what you'll see a pattern of more frequency instead of one large bolus is more
> paced throughout the next three or four quarters, which by the way is also very

effective for our operations. So it aligns real well with where we want to be long-term.

(Emphasis added).

112.    In response to a question seeking clarification on the destocking and whether the

Company's prior guidance incorporated anticipated reduced inventory, Defendant Birkett stated:

> What we did see, as we were progressing through Q2, the level of intra-quarter orders that we would have anticipated to materialize in that period of time, it wasn't at the rate that we would have expected it to be. So - and then there was some timing with customers moving some orders out late in the quarter that has impacted us.
>
> And then, as we've looked at the balance of the year and as we've rolled through the end of June and practically through July, what we're seeing in Q3 is that orders that we would have anticipated materializing for the period and even some for Q4, they just weren't coming through. ***And when we assess what was happening there, it's still really related to levels of destocking. So it's gone longer than we would have originally anticipated. And that is essentially the main driver***.
>
> And when we had looked at it originally, our coverage rate for Q3 and Q4 was pretty much in line or a little bit ahead of pre-COVID levels. But what hasn't happened then is filling in between the actual orders confirmed and the forecast that we had. That hasn't accelerated in the way that we would have anticipated that, that would take place. And so when we did the assessments, we felt that we have to be transparent and do the right thing and take the guide down and do it with the right level. We don't want to be in the position where we're cutting and cutting and cutting. So hence, the reason why the drop in the guide is pretty significant. It's not something we want to do, but it's a reality that we're dealing with today.

(Emphasis added).

113.    Moreover, when asked about the Company's deteriorating margins in light of its

prior guidance and long-term financial model, and to clarify expectations for margin expansion as

revenue growth recovered, Defendant Birkett stated:

> Yes. So the major impacts on margin that we've seen here in Q2 is really driven by volume and mix. And for high-volume manufacturing operation, any decrease in volume like that is going to have a significant impact. And what - where we're seeing it, Jacob, is really in HVP. So the drop is in biologics and generics. And so we're getting this kind of outsized impact on margin where, if you look back at - take the COVID years when we were getting a large amount of expansion in HVP and growth in that area, we were getting outsized margin expansion well beyond

43

our 100 basis points.

So essentially, what we're seeing now is the reverse of that. So when things normalize, we start to see growth again and getting back into our long-term construct, that volume growth will be driven within HVP and then also that aligns with the mix shift as well improving where our HVP was in the kind of mid-70s as a percent of proprietary revenues. And today, what we're saying it's about 71%. And that's the type of impact it has on our business. So when we're returning to growth, we would expect to see that margin recover pretty much - pretty quickly and in line with that growth, particularly around biologics and the generics space. . . . It's all in gross margin. The OpEx is pretty tight.

114.    On the news of continued destocking at higher rates than expected, the Company's stock price declined $46.61 per share, or approximately 14.4%, to close at $277.16 per share on July 25, 2024.

115.    Despite the news of continued destocking and disappointing margins, the Company continued to mislead investors by assuring them that the Company was on track and its financials and margins were normalizing.

116.    On October 24, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q24 Earnings Release"). The 3Q24 Earnings Release reported net sales of $746.9 million for the quarter, a 0.1% decline from the same quarter in 2023, net sales of $601.4 million for the Proprietary Products segment, a decline of 0.2%, and net sales of $145.5 million for the CM Products segment. The Company also increased its full year net sales guidance range and adjusted-diluted EPS range, citing "favorable currency movements" as the reason. Defendant Green was quoted in the 3Q24 Earnings Release as stating, in relevant part "[w]e are pleased to report solid third quarter results" and "[t]his reinforces my confidence in West's execution capabilities, as we continue to deliver our proven market-led strategy and attractive long-term potential."

117.    On the same day, the Company hosted an earnings call for investors and analysts

to discuss its financial results for the third quarter of 2024 (the "3Q24 Earnings Call"), during

which Defendant Green stated, in relevant part:

> We are also making significant progress in ramping up production of HVP delivery
> devices. The strong increase with on-body self-injection devices during the quarter,
> was driven by a combination of capital investment, improved utilization and the
> implementation of a new production line. We anticipate this ramp-up to continue
> into the fourth quarter, as we execute on our expansion plans. ***We have initiatives
> in place to improve the margin, including optimizing our manufacturing process,
> driving efficiency through automation and scaling to fulfill customer demand***.
>
> Now let me shift to destocking, as this remains a factor with our customers. We are
> starting to see signs of stabilization within our business and in recent customer
> discussions, we have observed a positive shift with some customers showing
> interest in increasing their near-term order levels. This gives us confidence that
> we're getting closer to a turning point in the destocking trend. ***We now expect
> continued signs of normalization in our pharma business, improving trends in
> biologics driven by the ramp-up in delivery devices and continued destocking with
> some generic customers into 2025***.

(Emphasis added).

118.    Also during the 3Q24 Earnings Call, Defendant Birkett stated that "Proprietary

Products organic net sales decreased 0.5% in the quarter. High-Value Products, which made up

approximately 75% of Proprietary Products sales in the quarter, declined by low single digits

primarily due to destocking of our FluroTec, Nova brand and Westar products, offset by an

increase in sales of our drug delivery devices" and that "Contract Manufacturing third quarter gross

profit margin of 19.9%, was 130 basis points greater than the margin achieved in the third quarter

of 2023 primarily due to production efficiencies."

119.    In response to a question about destocking during the 3Q24 Earnings Call,

Defendant Green stated:

> Yeah. Justin, let me take the first part and then, Bernard, if you don't mind, the
> second part. In regards to kind of where we are with the destocking area, I think the
> way that we've been consistently communicating is that it's not equal across the
> entire customer portfolio and/or product portfolio. But by the way, the product
> portfolio is really driven by the market segments. And so we've been pretty clear

that in the pharma area, the small molecule, we've seen that more normalize recently. So we feel, if you want to look at from the spectrum, it's closer to the end, let's say. And we're starting to see more normalization of order patterns and future outlook.

When we look at the biologics, we -- it is very clear with our customer conversations, if you take the drug delivery devices off the table from a discussion point of view, the elastomers and products used for containment, that particular area, we continue to see destocking in Q3. And as we mentioned, we'll see a little bit more in Q4. We do see that getting closer to the end, but we – let's go through our Q4. And as we think about our order book going forward, we'll update you in the first part of the year about 2025.

Biologics, so we've been pretty consistent that particularly a few customers that we believe that while there is some positive conversations about future demand, it's -- we do believe that's going to continue to the first part of 2025. So that's how we look at it from a destocking point of view. I didn't give you an aggregate total on that, but it is mix based on the customer segments. And it's pretty – it's playing out as we started to communicate, let's call it, the last quarterly call. And we'll keep an eye on that and make sure that we deliver and the year, we'll reassess as we think about going forward.

120.    Defendant Birkett responded to the same question, stating:

On the margin, what we would expect is when demand normalizes and our mix normalizes, that we would get back to our 2023 levels of operating margin and then through the long term construct, grow 100 basis points per year off that.

When we look at what's occurred this year in 2024, much of the destocking we've seen within biologics and generics, and that's where typically we would tend to see more HV product sales. And obviously, then the margin impact has been greater than what we would have seen prior to that when we saw de-stocking within pharma.

If you go back and look at our margin expansion over 2021 and into 2022, a lot of that was driven by HVP growth and that mix shift. So that shows you the power of the construct we have. And when that biologics engine starts growing again and gets back to normalized levels of growth, we would expect to see that margin start to expand. And first thing is we need to get back to like pre-2024 levels of margin and then start growing off that. We're confident that will happen over time.

121.    When asked about the ramp up of the Company's SmartDose device during the

3Q24 Earnings Call, Defendant Green stated:

Yeah. Good morning, Paul, and thanks for the question. Twofold. The first one on

SmartDose, particularly our Phoenix facility, you're correct, that ramp-up started in Q3, where we did receive FDA approval for commercial manufacturing into the market. And we're really excited about that new team that has been put together and just the level of capability of the ramp-up. They're meeting expectations, and I'm really proud of that team to really go from a brand-new facility and now producing high-quality product that's going to the market. So I'm very pleased.

As you know, a lot of these start-ups and ramp-ups do take time. So it's going to be -- it's going to take several quarters to get to what I call peak throughput, but the initial results are very, very positive. In regards to the facilities, investments in Grand Rapids and Dublin, these are two Contract Manufacturing facilities that are really focused on the -- to be able to support our customers in GLP-1s. On Grand Rapids, Michigan, that is still ramping up as we speak. We are producing commercial product, but it is still in ramp-up phase. As you know, that takes probably a good three to five quarters to really get to the levels that we expect and what our customers expect as far as throughput.

On Dublin, it's a little bit longer. This is kind of a two-stage approach. The first is the manufacturing of the devices for Contract Manufacturing, again, GLP-1s. And that will commence shortly, probably early 2025. And as that ramps up, we're also adding in that facility, already communicated before, but just to reiterate, the drug handling. So we'll be taking a finished drug product contained and put it with our -- the device that we're going to manufacture there so it's a complete solution for our customer.

We're really excited about that because that's playing out our high-value product or our high-value focus on Contract Manufacturing, adding services and capabilities that really help us expand not just revenue but also margin in that particular business. So they're different timelines. They're on us right now. The teams are executing within -- as planned, and I'm excited to see full production in the near future from both sites.

122.    Also during the 3Q24 Earnings Call, when asked about the Company's outlook for its CM Products segment, Defendant Birkett highlighted West's optimistic outlook for an increase in margins, stating, in relevant part:

Yeah, Matt. *I think if you're looking out over the next like 12 to 24 months, we see a slight uptick on the Contract Manufacturing*, as drug handling business comes on board because that is a very different margin profile for our Contract Manufacturing business. But for us to scale that is going to take a little bit of time. *So I would anticipate the margins around Contract Manufacturing to be relatively consistent with what they are now*.

We get a little bit of variability between quarters depending on product mix and the

level of kind of DA or engineering work that's involved. That's pretty consistent within that high teens. . . .***So it's more longer term where we would see it's like a significant step-up in the margins within CM***.

(Emphasis added).

123.    The statements contained in ¶¶ 116-122 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth is Revealed***

124.    On February 13, 2025, the truth was fully revealed when the Company issued the 4Q24 Earnings Release and revealed that the Company's revenue forecast for 2025 was in the range of $2.88 billion to $2.91 billion and adjusted-diluted EPS expected to be in the range of $6.00 or $6.20, both of which were significantly below previously stated expectations.

125.    During the accompanying earnings call for investors and analysts held on the same day to discuss the Company's financial results for the fourth quarter of 2025 (the "4Q24 Earnings Call"), the Company attributed the disappointing financial guidance to CM headwinds, including the loss of two major CGM customers that began transitioning to in-house manufacturing of next-

generation devices because the Company "made the decision to not participate going forward as our financial thresholds cannot be achieved." The Company also revealed that West's SmartDose wearable injector would become "margin dilutive" in 2025 due to lower pricing.

126.    On this news, the Company's stock price fell $123.17 per share, or approximately 38%, to close at $199.11 per share on February 13, 2025.

***Insider Sales***

127.    During the Relevant Period, Defendants Green, Hofmann, Birkett, and Lai made sales of West's common stock while in possession of non-public information concerning the Company's business prospects and financial condition.

128.    While the Company's stock price was artificially inflated, Defendant Green sold approximately 218,132 shares of West common stock, totaling proceeds of over $77.4 million. Defendant Green made the following sales of West stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 3/7/2023 | 44,000 | $322.35 | $14,183,400 |
| 5/9/2023 | 44,000 | $363.10 | $15,976,400 |
| 2/27/2024 | 64,132 | $359.85 | $23,077,900.20 |
| 5/7/2024 | 66,000 | $366.65 | $24,198,900 |

129.    While the Company's stock price was artificially inflated, Defendant Hofmann sold approximately 1,829 shares of West common stock, totaling proceeds of over $668,843. Defendant Hofmann made the following sales of West stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 5/1/2023 | 1,212 | $365.57 | $443,070.84 |
| 5/10/2024 | 617 | $365.92 | $225,772.64 |

130.    While the Company's stock price was artificially inflated, Defendant Birkett sold approximately 22,334 shares of West common stock, totaling proceeds of nearly $8.2 million.

Defendant Birkett made the following sales of West stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/2/2023 | 22,334 | $370.39 | $8,272,290.26 |

131.    While the Company's stock price was artificially inflated, Defendant Lai sold approximately 21,101 shares of West common stock, totaling proceeds of over $8.3 million. Defendant Lai made the following sales of West stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 8/11/2023 | 21,101 | $395.12 | $8,337,427.12 |

132.    As a result of these insider sales, Defendants Green, Hofmann, Birkett, and Lai were unjustly enriched.

***Stock Repurchases During the Relevant Period***

133.    According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed above, the Individual Defendants caused the Company to repurchase approximately 2,938,348 shares of its own stock, for a total of over $1 billion during the Relevant Period.

134.    According to the Company's public filings, West made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchase | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| March 1, 2023 to March 31, 2023 | 183,360 | $327.90 | $60,123,744 |
| April 1, 2023 to April 30, 2023 | 166,937 | $354.49 | $59,177,497.13 |
| May 1, 2023 to May 31, 2023 | 198,889 | $352.63 | $70,134,228.07 |
| June 1, 2023 to June 30, 2023 | 126,884 | $347.02 | $44,031,285.68 |
| July 1, 2023 to July | 58,770 | $359.42 | $21,123,113.40 |

| 31, 2023 | | | |
|---|---|---|---|
| August 1, 2023 to August 31, 2023 | 18,559 | $362.88 | $6,734,689.92 |
| November 1, 2023 to November 30, 2023 | 261,080 | $339.86 | $88,730,648.80 |
| December 1, 2023 to December 31, 2023 | 251,182 | $351.49 | $88,287,961.18 |
| January 1, 2024 to January 31, 2024 | 268,892 | $349.37 | $93,942,798.04 |
| February 1, 2024 to February 29, 2024 | 235,369 | $377.73 | $88,905,932.37 |
| March 1, 2024 to March 31, 2024 | 225,418 | $373.17 | $84,119,235.06 |
| April 1, 2024 to April 30, 2024 | 244,913 | $384.04 | $94,056,388.52 |
| May 1, 2024 to May 31, 2024 | 217,672 | $357.64 | $77,848,214.08 |
| June 1, 2024 to June 30, 2024 | 46,751 | $326.54 | $15,266,071.54 |
| July 1, 2024 to July 31, 2024 | 55,907 | $316.00 | $17,666,612.00 |
| August 1, 2024 to August 31, 2024 | 59,383 | $298.76 | $17,741,265.08 |
| September 1, 2024 to September 30, 2024 | 55,481 | $304.71 | $16,905,615.51 |
| October 1, 2024 to October 31, 2024 | 65,531 | $297.81 | $19,515,787.11 |
| November 1, 2024 to November 30, 2024 | 52,917 | $321.15 | $16,994,294.55 |
| December 1, 2024 to December 31, 2024 | 54,798 | $326.64 | $17,899,218.72 |
| January 1, 2025 to January 31, 2025 | 46,069 | $336.96 | $15,523,410.24 |
| February 1, 2025 to February 28, 2025 | 43,586 | $269.18 | $11,732,479.48 |

135.    Given that the price of West stock was $199.11 per share on February 13, 2025, after the corrective disclosures, the true value of the 2,938,348 repurchased shares was roughly $585 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $441.4 million to repurchase these shares during the Relevant Period.

**Harm to the Company**

136.    As a direct and proximate result of the Individual Defendants' misconduct, West has lost and expended, and will lose and expend, millions of dollars.

137.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Green, Birkett, and Lai, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

138.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

139.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

140.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

141.    Plaintiff will adequately and fairly represent the interests of West and its shareholders in enforcing and prosecuting its rights.

142.    West is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

143.    Plaintiff is a current shareholder of West and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein.  Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

144.    A pre-suit demand on the Board of West is futile and, therefore, excused.  At the time this action was commenced, the twelve-person Board consisted of Individual Defendants

Keller, Michels, Green, Haugen, Buthman, Joseph, Lai-Goldman, Pucci, Friel, Lockhart, Hofmann, and Feehery (the "Director Defendants"). Accordingly, Plaintiff is only required to show that six Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

145.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

146.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

147.    Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

148.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to

these claims. Specifically, as Board members of West, the Director Defendants knew, or should have known, the material facts surrounding West's financial condition and internal control mechanisms.

149.    Director Green is not disinterested or independent. In addition to being a director, Green also serves as CEO and President of the Company. Thus, the Company admits that Green is a non-independent director.

150.    Furthermore, Keller, Michels, Green, Buthman, Joseph, Lai-Goldman, Pucci, Friel, Lockhart, Hofmann, and Feehery each signed the 2022 10-K and 2023 10-K. Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

151.    Moreover, Director Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci each solicited the 2023 Proxy, which led to the reelection of Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

152.    Director Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci each solicited the 2024 Proxy, which led to the reelection of Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

153.    Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

154.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Furthermore, Defendants Green and Hofmann each made insider sales of the Company's common stock while the price was artificially inflated as a result of the materially false and misleading statements alleged herein.

155.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.  As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

156.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

157.    Defendants Hofmann, Feehery, Haugen, Keller, Michels, and Pucci (the "Audit Defendants") serve on the Company's Audit Committee, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting.  At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above.  Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

158.    Moreover, all of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct

159.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

160.    Accordingly, a pre-suit demand on the Board is futile and excused.

### COUNT I
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

161.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

163.    Section 14(a) of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

164.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

165.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 Proxy and 2024 Proxy (collectively, the "Proxy Statements"), which were each filed with the SEC. As alleged above, the Proxy Statements were materially false and misleading because it failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company.

166.    The misrepresentations and omissions in the Proxy Statements were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, the reelection of certain of the Defendants to the Board.

167.    The materially false and misleading statements contained in the 2023 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

168.    The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Buthman, Feehery, Friel, Green, Hofmann, Joseph, Keller, Lai-Goldman, Lockhart, Michels, and Pucci to the Board,

thereby allowing them to continue breaching their fiduciary duties to the Company.

169.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxy Statements.

170.    As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

171.    Plaintiff, on behalf of West, has no adequate remedy at law.

### COUNT II
**Against the Individual Defendants for Violations of Section 10(b) of
the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding West. Not only is West now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon West by the Individual Defendants.

174.    During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by approximately $585 million to repurchase over 2.9 million shares of West common stock.

175.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

176.    The Individual Defendants employed devices, schemes, and artifices to defraud

while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about West not misleading.

177.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by West.

178.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

179.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over $1 billion million in the repurchase of West stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

180.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

181.    Plaintiff, on behalf of West, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendants had the authority to cause the Company to issue materially false and misleading statements, and to repurchase West stock at prices artificially inflated by those materially false and misleading statements.

184.    Plaintiff, on behalf of West, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Breach of Fiduciary Duty

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

187.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

188.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the

Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

189.    Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (a) the Company was experiencing significant and ongoing destocking across its high-margin HVP portfolio; (b) West's SmartDose device, which was purportedly positioned as a high-margin growth product, was highly dilutive to the Company's profit margins due to operational inefficiencies; (c) these margin pressures created the risk of costly restructuring activities, including the Company's exit from CGM contracts with long-standing customers; (d) the Company failed to maintain adequate internal controls over its public reporting; and (e) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

190.    The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

191.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and

omissions of material fact referenced herein.

192.    Moreover, in further breach of their fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

193.    Furthermore, four of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

194.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

195.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

196.    Plaintiff, on behalf of West, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

197.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

198.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged,

facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

199.    Plaintiff on behalf of West has no adequate remedy at law.

**COUNT VI**
**Against the Individual Defendants for Unjust Enrichment**

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, West.

202.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from West that was tied to the performance or artificially inflated valuation of West, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

203.    Plaintiff, as a shareholder and a representative of West, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

204.    Plaintiff on behalf of West has no adequate remedy at law.

**COUNT VII**
**Against the Individual Defendants for Waste of Corporate Assets**

205.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

63

206. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

207. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase over 2 million shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

208. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

209. Plaintiff, on behalf West, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

     E.     Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.


DATED: June 20, 2025           **RIGRODSKY LAW, P.A.**

           By:  */s/ Gina M. Serra*
                Gina M. Serra
                1007 North Orange Street, Suite 453
                Wilmington, DE 19801
                Telephone: (302) 295-5310
                Facsimile: (302) 654-7530
                Email: gms@rl-legal.com

                *Attorneys for Plaintiff*


**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
Leah B. Wihtelin
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
      vl@rl-legal.com
      lw@rl-legal.com